## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-22-00376-JD |
| | ) | |
| LOUIS JEROME JONES, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>ORDER</u>

Before the Court is Defendant Louis Jerome Jones' Motion to Suppress Evidence and Statements and Brief in Support [Doc. No. 27], which the United States timely opposed [Doc. No. 45]. A hearing was held on December 13, 2022, at which the Court also heard the *Jackson v. Denno*[1] issues raised by Mr. Jones in his Omnibus Motion in Limine [Doc. No. 40].[2]

At the hearing, Mr. Jones personally appeared with his appointed counsel, Assistant Federal Public Defender Traci Lynn Rhone, and the United States appeared through Assistant United States Attorneys Daniel Gridley and Bow Bottomly. The Court received the testimony of two witnesses: Oklahoma City Police Department ("OCPD") Lt. Joshua Castlebury and OCPD Officer Dakota Boxwell. Both parties submitted as evidence the previously submitted videos, which were conventionally filed of record at

---

[1] *Jackson v. Denno*, 378 U.S. 368 (1964).

[2] The government's response is at [Doc. No. 43].

[Doc. Nos. 28, 44, 46, and 57], and portions of the videos were played during the hearing. The Court has reviewed the videos in their entirety, which include Air One surveillance video of the traffic stop; audio and video footage from the body camera worn by Officer Boxwell; exterior dashcam footage from Lt. Castlebury's police car; and backseat audio and video footage from inside Lt. Castlebury's police car and Officer Boxwell's police car—all of which were recorded on August 3, 2022. Upon consideration of the filings and evidence presented, and having reviewed the relevant law, the Court issues its ruling.

## I.    **PROCEDURAL HISTORY AND BACKGROUND**

Mr. Jones is charged in a one-count Indictment with being a felon in possession of a firearm on or about July 2022 through on or about August 3, 2022, in violation of 18 U.S.C. § 922(g)(1). [Doc. No. 1]. Mr. Jones' jury trial is set on the January 10, 2023 jury trial docket. [Doc. Nos. 53, 56].

The charge stems from a search of Mr. Jones' vehicle following a traffic stop on the I-35 service road between Southeast 44th Street and Southeast 51st Street on August 3, 2022, in Oklahoma City. Mr. Jones seeks to suppress the firearm obtained from his vehicle by police and the statements he made to Lt. Castlebury and Officer Boxwell following the traffic stop.

Mr. Jones asserts that the traffic stop was pretextual in nature and unjustified at its inception because there was no observable traffic violation as seen in Lt. Castlebury's dashcam video or in the Air One surveillance video. He also contends that the vehicle search was not reasonably related to the justification for the initial traffic stop and that the traffic stop was prolonged without reasonable suspicion. Additionally, Mr. Jones asserts

that he unequivocally invoked his *Miranda* rights with Lt. Castlebury and that Officer Boxwell should not have initiated contact with him after invocation of his Fifth Amendment rights. As a result, he contends that his statements to both officers were not voluntarily made and, as such, are inadmissible at trial.

Counsel for the United States, citing to *Whren v. United States*, 517 U.S. 806 (1996), concedes it was a pretextual traffic stop but asserts that the subjective intent of the officer conducting the traffic stop is irrelevant to the question of reasonableness. The United States also asserts that Lt. Castlebury did observe a traffic violation and that the timing and scope of the stop was very limited in duration and in accordance with normal police protocol after Mr. Jones consented to a search of his vehicle. Finally, the United States maintains that under the totality of the circumstances, Mr. Jones voluntarily waived his *Miranda* rights when speaking with Officer Boxwell, and that prior to speaking to Officer Boxwell, Mr. Jones, although upset, did not unequivocally invoke his right to counsel or his right to remain silent.

## II.   **FINDINGS OF FACT**[3]

On August 3, 2022, members of the OCPD's Violent Crimes Apprehension Team ("VCAT") were conducting surveillance of a gang-related funeral near the area of

---

[3] Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to "state its essential findings on the record" when deciding a motion that involves factual issues. These findings of fact shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. *See United States v. Merritt*, 695 F.2d 1263, 1269–70 (10th Cir. 1982). In deciding such preliminary

Northeast 36th Street and I-35. The deceased, Mark Anthony Johnson, was a Blood gang member who had been shot and killed, and VCAT's purpose in monitoring the funeral was twofold: (1) because of a concern for public safety; and (2) because the deceased's family or personnel from the funeral home had requested police assistance. In the month leading up to the funeral, there had been an ongoing feud between the Bloods and the Shotgun Crips, which are rival gangs in Oklahoma City. The ongoing feud had included several shootings, some of which resulted in homicides, and one of which transpired at a family gathering after a funeral. This particular funeral was concerning because it was taking place in Shotgun Crip territory.

Lt. Castlebury testified that VCAT has monitored gang-related funerals in the Oklahoma City area for some time.[4] In his experience, follow-up violence, including retaliatory shootings, oftentimes occurs at or shortly after funerals. He advised that gang members come together at these funerals, "emotions are high," and generally most of the gang members are armed. This presents a public safety issue. Lt. Castlebury recalled conducting surveillance at one gang-related funeral where a shooting occurred in the

---

questions, the Federal Rules of Evidence, except those involving privilege, do not apply. *See* Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress.

[4] In making its factual findings, the Court notes for the record that based upon its observations at the hearing, the Court finds Lt. Castlebury's and Officer Boxwell's testimony to be credible. *See, e.g.*, *United States v. Romero*, 247 F. App'x 955, 960 (10th Cir. 2007) (unpublished) (explaining that the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters most appropriate for resolution by the district court") (citation omitted).

parking lot. He advised that VCAT has conducted multiple firearm arrests pursuant to their surveillance of gang-related funerals.

On this particular day, detectives were set up outside the funeral home in unmarked police cars and several marked patrol units were also nearby. Officers in the marked patrol cars were there to respond to any disturbances at the funeral home and to conduct traffic stops. Lt. Castlebury was in his marked police car near the funeral home, and he was acting in his role as supervisor and also assuming the same duties as the rest of the team present.

OCPD Inspector Michael Klika and Officer Wes Cadena, both OCPD detectives with the violent crimes investigations unit, were conducting surveillance from inside unmarked police cars in the parking lot of the funeral home. Around 1:30 p.m., Lt. Castlebury heard Inspector Klika on the police radio indicate that he had observed the driver of a black SUV leave the funeral home armed with a handgun.

Detectives Cadena and Sellers[5] began following the black SUV in an unmarked police car. As Detective Cadena followed the black SUV, he continued to provide information over the police radio as to where the black SUV was located. Air One, the police helicopter, was also surveilling the black SUV. Lt. Castlebury was in the area of Southeast 44th Street and the I-35 service road when he first observed the black SUV turn southbound on the service road. Lt. Castlebury testified that it was clear to him from

---

[5] Officer Sellers' first name was not mentioned during the hearing.

the directions of Detective Cadena and Air One which vehicle the officers were referring to on the police radio.[6]

Lt. Castlebury testified that he "fell in behind the vehicle" and observed the driver commit a traffic violation in the area of Southeast 44th Street and 51st Street— specifically, the vehicle on the driver's side was straddling lane lines of traffic without signaling in violation of Oklahoma City Municipal Code § 32-191. Lt. Castlebury estimated he was about 50 yards behind the vehicle when he observed the traffic violation.[7] Lt. Castlebury readily conceded on cross-examination that this was a pretextual traffic stop based on information that a gang member had a firearm inside his vehicle, and an attempt was made to observe a traffic violation to conduct a traffic stop, complete an enforcement action on the traffic stop, and investigate the firearm offense.

Lt. Castlebury testified that the lane violation is not visible from his dashcam video, and he offered several possible explanations for why this is. First, his dashcam activates one of three ways—manually, when the emergency lights are activated, or when another camera activates close by. Additionally, the way the software is set up, the video

---

[6] From the Court's review of the Air One video, the police helicopter starts surveillance of the black SUV at 13:32:21. One officer can be heard on the police radio indicating that the driver of the black SUV had a firearm. Detective Cadena ("Wes") and Lt. Castlebury ("Josh") can also be heard on the police radio. At 13:34:16, an officer in the police helicopter states, "We're with you, Josh," as Lt. Castlebury indicates he is about to effectuate a traffic stop of the black SUV.

[7] The Court would note from its review of the Air One video surveillance that Lt. Castlebury's marked police vehicle comes into the view of the camera at 13:34:33 behind the black SUV, which is heading southbound on the I-35 service road.

footage from his front dashcam will go back 30 seconds prior to its activation, but it only

captures video from the 30 seconds prior and not audio. Thus, he stated that it is possible

that the lane violation occurred more than 30 seconds prior to him activating his

emergency lights, which would indicate why it is not captured on the video. Lt.

Castlebury also indicated that there was a slight crest in the road that could have blocked

the camera's view. Additionally, the camera is positioned to the right of his rearview

mirror, which presents a different angle from his view of the road, and he admitted that

the camera is only two-dimensional and does not capture everything. However, he

testified that he clearly observed the lane violation that day, and that in his opinion, and

from his review of the video, the traffic violation is visible on the Air One surveillance at

13:34:25.[8]

Lt. Castlebury effectuated a traffic stop for the lane violation shortly after the

Southeast 51st Street exit. Based on the information that the driver had left a gang-related

funeral and was armed, Lt. Castlebury stated that he approached this traffic stop as if

there was a gun in the vehicle. He had the driver, who he identified as Mr. Jones, roll

down the driver's side window, so he could see inside the vehicle as he approached.

Detective Cadena arrived in his undercover vehicle as Lt. Castlebury initiated the traffic

stop of Mr. Jones.

---

[8] From the Court's review of the Air One video surveillance, the black SUV, on
the driver's side, straddles the lane lines without signaling just south of the exit off I-35
where the two-lane service road becomes three lanes of traffic at 13:34:25. Prior to this,
and visible on the Air One surveillance video, the black SUV straddled lane lines and
changed lanes without signaling at 13:33:09, again at 13:33:13, and at 13:33:33.

Lt. Castlebury shook hands with Mr. Jones. He indicated he typically does this on all traffic stops because it helps ease the driver, initiates a conversation, and—because most people are right-handed and reach over to shake hands with their right hand—it allows him to see if someone has a firearm on their right side. Lt. Castlebury detected what he thought were "prison-style tattoos" on Mr. Jones' arms because the lines appeared to be "jagged" and lacked color.

Lt. Castlebury then began his standard procedure of requesting Mr. Jones' driver's license and evidence of insurance. Mr. Jones had a valid driver's license, but he did not produce proof of insurance, which is a potential violation of the law on its own. Because Lt. Castlebury was issuing Mr. Jones a verbal warning for the improper lane change, he needed to fill out a field interview card, which includes the driver's information, the vehicle's information, and the reason for the traffic stop, and he also wanted to check to make sure that there were no outstanding warrants for Mr. Jones' arrest. This process generally takes about 10 to 15 minutes, and Lt. Castlebury either uses his computer in his police vehicle or calls over the police radio to contact the crime information unit to verify this information. Thus, he escorted Mr. Jones back to his police car to complete the enforcement action.[9]

---

[9] Lt. Castlebury advised that he did not want to leave Mr. Jones sitting in his car while Lt. Castlebury went back to his police car to complete the enforcement action because of his concern that a firearm was inside Mr. Jones' vehicle. He escorted Mr. Jones with Mr. Jones' hands behind his back and fingers interlaced to his police car, but he did not handcuff him. Lt. Castlebury told Mr. Jones at that time he was only issuing him a verbal warning, but that he needed to verify his information back at the police car. Visible on Castlebury's dashcam footage at 13:38:09 is Lt. Castlebury escorting Mr.

According to Lt. Castlebury, he asked Mr. Jones for permission to search his pockets, and Mr. Jones consented. The pat down search of Mr. Jones' person generated nothing of significance. Lt. Castlebury next asked Mr. Jones if there were any firearms in the vehicle, to which Mr. Jones said there were none. Lt. Castlebury stated he then asked Mr. Jones if he could search the vehicle, and Mr. Jones consented to a search of the vehicle. Lt. Castlebury testified this conversation is not captured on audio because it occurred outside the police car, he is not equipped with a body camera, and the microphone on his dash camera is inside the police car on the windshield.[10] He indicated their interaction was cordial and that Mr. Jones was cooperative. He then placed Mr. Jones in the backseat of his police car; Mr. Jones remained unhandcuffed. Lt. Castlebury began filling out the field interview card while he asked Mr. Jones about the funeral.

He asked Mr. Jones, "Do you know who shot your brother?"[11] *See* Castlebury's Dashcam Footage at 13:39:29. Mr. Jones responded that he had heard names, and Lt. Castlebury told him the police were trying to figure out who hurt Mr. Jones' brother. Lt. Castlebury testified that Mr. Jones appeared willing to talk about the funeral and the death of his brother, and that the two engaged in a cordial conversation.

---

Jones back to his police car with his left hand on Mr. Jones' hands that are behind Mr. Jones' back, and Officer Cadena follows behind them, but he does not touch Mr. Jones.

[10] This conversation transpired between 13:38:02, when Mr. Jones got out of his vehicle and was escorted back to Lt. Castlebury's police car, and 13:39:28 when Mr. Jones got in the backseat of Lt. Castlebury's patrol car.

[11] Mr. Jones refers to the deceased as his brother; however, testimony from the officers at the hearing revealed that the deceased was Mr. Jones' close friend and not his biological brother.

Their cordial exchange is corroborated from the dashcam footage. Mr. Jones indicated that he believed the people involved in the Ice Events Center shooting were the same people who shot his brother. At 13:40:00, during this exchange, Lt. Castlebury can be heard on the dashcam footage instructing someone to conduct a consent search of the vehicle.

Lt. Castlebury testified that other officers from his unit had arrived on scene at that point, and that he instructed Officer Chris White to conduct a search of the vehicle based off Mr. Jones' consent. Visible on the dashcam footage is five officers executing a search of the vehicle while Lt. Castlebury and Mr. Jones continue to talk about the shooting of Mr. Jones' brother. Mr. Jones does not at any point indicate that he does not want the officers to search the vehicle. Lt. Castlebury testified that Mr. Jones was in earshot when he directed Officer White to conduct the search and that the point in having other officers execute the search was so that he could stay behind with Mr. Jones in case Mr. Jones decided to revoke his consent. Lt. Castlebury advised that Mr. Jones never revoked his consent.

As the officers searched the vehicle, Mr. Jones told Lt. Castlebury that he had just left his brother's funeral and was on his way to the shop to work. Lt. Castlebury asked for Mr. Jones' address at that point, and Mr. Jones confirmed it was the same address on his driver's license. Lt. Castlebury then asked for Mr. Jones' phone number, and Mr. Jones relayed his phone number. At 13:42:04 on the dashcam footage, Officer White made a gun motion with his hand indicating to Lt. Castlebury that he had found a firearm inside the vehicle. Lt. Castlebury testified that he was still completing his computer checks and

10

filling out the field interview card when Officer White indicated he had found a gun. This is corroborated by the dashcam footage.

It was around this same time that Lt. Castlebury said he confirmed that Mr. Jones was a convicted felon from the Department of Corrections' website. Lt. Castlebury estimated that less than 3 minutes had transpired between him escorting Mr. Jones back to his patrol car and the officers finding the firearm pursuant to the consent search of the vehicle.

Shortly thereafter, Mr. Jones is notified of the firearm inside the vehicle, to which he responds, "Are you serious?" Mr. Jones then advises that the vehicle belongs to his brother who just passed away, and continues to repeat, "Are you serious? This can't be happening." Lt. Castlebury advises him, "We can work through it, dude. You are in a bad spot. I'm here to help you, ok." Mr. Jones indicated the SUV belonged to his deceased brother and that he was taking it to his shop to work on it before returning it to his brother's family.

At 13:45:17, Lt. Castlebury got out of his car and went up to Mr. Jones' vehicle to examine the firearm. When he came back to his police car, Lt. Castlebury handcuffed Mr. Jones. *See* Castlebury's Dashcam Footage at 13:46:45. He told Mr. Jones that he was not free to go, and he attempted to read Mr. Jones his *Miranda* rights.

Lt. Castlebury testified that when Mr. Jones was notified of the firearm being found in the vehicle that Mr. Jones became "excited," and he started to move around a lot in the backseat of the patrol car. The change in Mr. Jones' demeanor is corroborated by the dashcam footage. Mr. Jones kept repeating that this could not be happening to him,

and he repeatedly stated that people were going to kill him. Lt. Castlebury stated he assumed that Mr. Jones was referring to the Shotgun Crips.

Lt. Castlebury attempted to read *Miranda* several times to Mr. Jones, but he was not able to finish the process because each time Mr. Jones would speak over Lt. Castlebury in an excited manner. Lt. Castlebury testified that Mr. Jones never gave him a clear answer as to whether he wanted to talk, but that Mr. Jones also never said that he wanted an attorney or that he did not want to talk. This is corroborated by the dashcam footage.

Lt. Castlebury testified that Mr. Jones was "wrapped up in his emotions," so he decided to stop and wait for Mr. Jones to calm down in order for him to "wrap his head around" the fact that the police had found a firearm inside the vehicle. Lt. Castlebury said that although Mr. Jones was upset, he was still coherent. Lt. Castlebury thought maybe Mr. Jones did not understand what he was saying because he continued to speak over him and attributed Mr. Jones' excitement and demeanor to the fact that the police had found a firearm and because of the gang war that was occurring.[12] Lt. Castlebury testified that he

---

[12] Starting at 13:47:36, Lt. Castlebury tells Mr. Jones that he is not free to go, and he starts to read *Miranda*. Mr. Jones, talking over Lt. Castlebury, states that he cannot go to jail because "they" will kill him. Lt. Castlebury asks Mr. Jones if he understands what he just said, and Mr. Jones indicates he does not. At 13:49:01, Lt. Castlebury attempts to read *Miranda* a second time, and Mr. Jones continues to repeat this cannot be happening and that they are going to kill him. Mr. Jones appears to become more distraught. Lt. Castlebury asks Mr. Jones if he understands his rights, and Mr. Jones states that he does not right now. A little bit later, Mr. Jones asks "what can we do, man, because I cannot go to jail." Lt. Castlebury asks Mr. Jones again if he understands his rights as he has explained them, and Mr. Jones states he does not right now. Lt. Castlebury attempts to read *Miranda* a third time, and Mr. Jones keeps repeating "they are going to kill me." Lt. Castlebury says he "would love to talk to him about it." Lt. Castlebury then asks Mr.

arranged for Officer Boxwell to speak to Mr. Jones.[13] Mr. Jones was then removed from Lt. Castlebury's patrol car and placed in the backseat of Officer Boxwell's car. Lt. Castlebury indicated that someone adjusted Mr. Jones' handcuffs at that point because Mr. Jones had fallen back on them. Lt. Castlebury's last contact with Mr. Jones that day was to arrange for an officer to take Mr. Jones' vehicle to Mr. Jones' shop down the street.

According to the camera inside Officer Boxwell's car, Mr. Jones is placed in the backseat at 13:54:10, and Officer Boxwell gets in the backseat with Mr. Jones at 13:55:52. Thus, there is about a four to five-minute break between Lt. Castlebury's last contact (13:51:37) and Officer Boxwell's contact with Mr. Jones.

Officer Boxwell testified that he was assigned to VCAT to work Mark Anthony Johnson's funeral on August 3. He advised that he was patrolling with Officer White in the same vehicle, and that they responded to the traffic stop of Mr. Jones around 1:30 p.m. Lt. Castlebury directed Officers Boxwell and White to conduct a consent search on Mr. Jones' vehicle, and Officer White found a black firearm in the center console area

---

Jones several times to listen, and he advises that he is going to read Mr. Jones his *Miranda* rights one more time, but that if Mr. Jones interrupts him, they will be done. Mr. Jones says, "ok." Lt. Castlebury once again reads *Miranda*, and Mr. Jones continues to talk over him. Lt. Castlebury asks Mr. Jones if he understands his rights, and Mr. Jones says, "I don't," followed by "I guess." Lt. Castlebury at that point states that "we're done," and he gets out of the car at 13:51:37.

[13] Lt. Castlebury indicated that Mr. Jones, although upset, was coherent, sober, and exhibited no signs of intoxication. Lt. Castlebury stated that he did not threaten or coerce Mr. Jones or promise him anything in exchange for his statements. This is substantiated in the videos.

behind a piece of plastic near the radio. Officer Boxwell indicated this was a known spot for people to hide firearms. Officer White collected the firearm as Officer Boxwell watched.

Officer Boxwell stated that he conducted his interview of Mr. Jones in the backseat of his patrol vehicle. He indicated that it is his practice to interview in the backseat so that he can experience the same environment as the person being interviewed. Mr. Jones did not complain of the temperature inside the patrol car, but he did ask for his handcuffs to be loosened, and Officer Boxwell adjusted the handcuffs. Officer Boxwell estimated that his interview of Mr. Jones lasted 5 to 10 minutes.

His interview of Mr. Jones is depicted in his body camera footage and the inside camera in his patrol car. Officer Boxwell *Mirandized* Mr. Jones by reading from a *Miranda* card, and Mr. Jones agreed to talk to him without an attorney present. Officer Boxwell indicated that Mr. Jones was upset about his situation, but he was coherent, sober, and was not acting abnormal for someone who had just been arrested. He did admit that Mr. Jones appeared to be "preoccupied" with the ongoing feud between the Bloods and Shotgun Crips. However, he thought their exchange was cordial, and Mr. Jones never asked for an attorney or state that he did not want to talk to him. Mr. Jones at one point acknowledged that he had consented to the officers searching his vehicle expressing to Officer Boxwell, "I even gave you all consent to search the vehicle." All of this is corroborated by the video footage from inside Officer Boxwell's police car.

Although Officer Boxwell testified that he did not recall Lt. Castlebury asking him to talk to Mr. Jones or that Lt. Castlebury had attempted to *Mirandize* Mr. Jones prior to

14

him speaking with him, he advised that Lt. Castlebury does not transport passengers to the county jail, and it was his intention to talk to Mr. Jones about the firearm inside his vehicle and the homicide involving Mr. Johnson.

A review of the video inside Officer Boxwell's police car depicts Officer Boxwell asking Mr. Jones for his name and if they can talk "man to man." Mr. Jones replies, "I'm listening." Officer Boxwell states that he needs to read Mr. Jones his *Miranda* rights first, and Mr. Jones states that the other officer already did that 2 to 3 times. Officer Boxwell reads *Miranda* and asks Mr. Jones if he wants to talk to him, and Mr. Jones states, "yes." Mr. Jones then states that the same people who killed his brother are going to kill him, and Officer Boxwell confirms that Mr. Jones means the Shotgun Crips. Mr. Jones states that he has "Blood tatted on him," and that he was just released from prison 6 months ago. He indicates that he served time for a firearm and for "CDS with intent."

Mr. Jones, on the video, also admits to holding the firearm about a month and a half before the traffic stop. He later admits that he held the firearm more recently, estimating it was about a week and a half before Mr. Johnson was killed. He is emphatic, however, that he did not know the firearm was inside the vehicle, notwithstanding the fact that he had been working on the SUV for about 2 to 3 months leading up to the traffic stop. And he indicates that had he known the firearm was in the vehicle, he would have driven off. Finally, Mr. Jones reiterates that he cannot go back to jail, and he states that he is "a convicted felon." The interview concludes with Officer Boxwell giving Mr. Jones water.

### III.   RELEVANT LAW AND ANALYSIS

### A.   Lt. Castlebury's traffic stop of Mr. Jones, although pretextual, was reasonable at its inception.

Mr. Jones begins by challenging the traffic stop. Specifically, he asserts that the traffic stop was pretextual in nature and unjustified at its inception because there was no observable traffic violation. The record supports the opposite conclusion. Based on the evidence at the hearing and the videos of record, Lt. Castlebury had reasonable suspicion for the traffic stop.

A traffic stop is a seizure under the Fourth Amendment "and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Id.* (citations omitted). The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). And it is "irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.*

Further, the constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. If an officer reasonably thinks he saw a driver commit a traffic infraction, then that is enough to pull him over. *See*, *e.g.*, *United States v. Reyes*, 202 F. Supp. 3d

1209, 1213 (D. Kan. 2016) (explaining that the "propriety of a stop does not depend on whether the suspect is actually guilty of committing a traffic offense; rather, the relevant question is whether it was reasonable for the officers to believe the offense had been committed") (citing *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

Lt. Castlebury had reasonable suspicion that Mr. Jones was violating a traffic law under Oklahoma City Municipal Code § 32-191 and Okla. Stat. tit. 47, § 11-309. Those provisions require a vehicle to be driven as nearly as practical entirely within a single lane, and a driver should not change lanes until the driver has first ascertained that such movement can be made with safety and given a signal, not less than the last 100 feet traveled by the vehicle, of the driver's intention to change lanes. *See id.*

A lane violation is visible on the Air One surveillance at 13:34:25 when the black SUV, on the driver's side, straddles the lane lines without signaling just south of the exit off I-35 where the two-lane service road becomes three lanes of traffic. Lt. Castlebury's actual motivation to investigate a possible firearm offense is immaterial. *See Botero-Ospina*, 71 F.3d at 787; *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (explaining that the constitutional reasonableness of traffic stops does not depend "on the actual motivations of the individual officers involved"); *Eckhart*, 569 F.3d at 1271 (explaining that if a police officer witnesses a traffic violation, then the traffic stop is justified at its inception); *United States v. Cook*, 25 F. Supp. 2d 1167, 1169 (D. Colo. 1998) ("[A] pretextual motive is irrelevant if there was a valid basis for stopping the vehicle in the first instance for a traffic or equipment violation."). Lt. Castlebury's desire

to pull over Mr. Jones' vehicle to investigate the firearm offense does not call into question the lawfulness of the traffic stop. Nor is that motivation enough to call into question his credibility. Lt. Castlebury testified that he witnessed a driving infraction, and the Court credits that testimony combined with the Air One surveillance video. Thus, the traffic stop was justified at its inception notwithstanding its pretextual nature.[14]

**B.     The traffic stop was reasonable in its scope and duration.**

Mr. Jones also asserts that the traffic stop was prolonged without reasonable suspicion of criminal activity. "It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). An officer may also ask about a driver's travel plans and about matters unrelated to the stop. *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); *Pettit*, 785

---

[14] At the hearing, defense counsel argued that Detective Cadena opening the back passenger door at the beginning of the traffic stop while Lt. Castlebury was at the driver's side was a nonconsensual search in violation of Mr. Jones' rights. The government argues it was for officer safety based on the prior information the officers had about Mr. Jones being gang-affiliated and armed, and that regardless, there was nothing of consequence as there was no evidence that flowed from Detective Cadena, even if it were an improper search. The parties did not cite any on-point authority for this precise issue or develop it from a legal or factual perspective. But it occurred well before Mr. Jones was in either Lt. Castlebury's or Officer Boxwell's backseats, and there is no evidence produced that Mr. Jones reacted to Detective Cadena opening the door or that Mr. Jones somehow felt coerced or impacted in any way. Mr. Jones himself later noted to Officer Boxwell that he gave consent to the search, and he was in Lt. Castlebury's backseat and in earshot when that consent was conveyed to Officer White and while the search was occurring, and he never revoked his consent. Moreover, the firearm was seized from the center console area behind a piece of plastic near the radio; it was not in plain view. The Court agrees with the government that this issue raised at the hearing appears to be of no consequence to the issues here.

F.3d at 1379. However, a lawful traffic stop may not extend beyond the time "reasonably required" to effectuate the purpose of the stop. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015); *see also United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015).

Beyond that point, "[c]ontinued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a 'reasonable suspicion' that the detained person is engaged in criminal activity." *Pettit*, 785 F.3d at 1379 (citing *United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005) and *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)).

Although the United States bears the burden of proving the reasonableness of the officer's suspicion, "[r]easonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010). "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause to effect an arrest." *Pettit*, 785 F.3d at 1379 (citing *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). To satisfy this standard, an officer is not required to "rule out the possibility of innocent conduct" or have evidence suggesting "a fair probability of criminal activity." *Esquivel-Rios*, 725 F.3d at 1236 (citations omitted). Rather, the officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (citations omitted). Further, the existence of objectively reasonable suspicion "'does not

depend upon any one factor, but on the totality of the circumstances.'" *Simpson*, 609 F.3d at 1146 (quoting *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)).

In deciding whether the United States has met this burden, the Court defers "to an officer's ability to distinguish between innocent and suspicious actions"; thus, the "evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*." *Id.* at 1146–47 (citations omitted).

Here, the traffic stop was not improperly prolonged. Lt. Castlebury was still conducting the requisite computer checks when the firearm was found inside the vehicle as part of a consensual search. Mr. Jones was inside Lt. Castlebury's police car for less than 3 minutes when the firearm was seized. Lt. Castlebury testified that his standard process usually takes 10 to 15 minutes. *See Mayville*, 955 F.3d at 832 & n.2 (noting that the "Fourth Amendment does not require officers to use the least intrusive or most efficient means conceivable to effectuate a traffic stop"). Additionally, Lt. Castlebury had information from his fellow officers that Mr. Jones was likely concealing a firearm.

Under the "fellow officer rule," also known as the "collective knowledge" doctrine, the Tenth Circuit has held "that law enforcement officers may pool their information and that reasonable suspicion is to be determined on the basis of the collective knowledge of all the officers involved." *United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997) (citation omitted). "This rule applies to an officer's corroboration of information received by radio dispatch." *Id.* (citation omitted).

In *Hinojos*, the Tenth Circuit affirmed a district court's denial of a defendant's motion to suppress. *Id.* at 769. The defendant was stopped for speeding by an Oklahoma

Highway Patrol trooper who had previously heard a police force broadcast that two

Hispanic men were transporting drugs in a teal-covered Chevy pickup truck, and the

broadcast provided the truck's license plate number. *Id.* at 766–67. The trooper witnessed

the defendant driving a vehicle matching the description of the vehicle, and he was

speeding. *Id.* at 767. There the information in the broadcast came from an informant's tip.

*Id.* The Tenth Circuit concluded that even though the corroboration "was supplied by the

officer who relied on the bulletin rather than the officer who received the tip and initiated

the bulletin," the "fellow officer" rule applied. *Id.* at 768. The trooper observed that the

defendant's truck matched the description in the bulletin, and that the defendant was

acting as the bulletin had predicted. *Id.* at 769. Thus, the trooper's corroboration provided

"adequate additional indicia of reliability, especially when considered together with the

testimony concerning the source of the tip." *Id.*

　　　　Similarly in *United States v. Chavez*, extrapolating from *United States v.*

*Hensley*,[15] the Tenth Circuit concluded that the patrolman acted on the strength of the

Drug Enforcement Agency's probable cause when he stopped and searched the

defendant's truck. *Chavez*, 534 F.3d 1338, 1348 (10th Cir. 2008). The patrolman "merely

---

[15] *See United States v. Hensley*, 469 U.S. 221, 231 (1985), in which the Supreme
Court noted that "when evidence is uncovered during a search incident to an arrest in
reliance on a flyer or bulletin, its admissibility turns on whether the officers who *issued*
the flyer possessed probable cause to make the arrest." (emphasis in original). There,
police officers had initiated a *Terry* stop in reliance on a "wanted flyer." *Id.* at 233. On
the facts before it, the Supreme Court concluded that, so long as the officers that issued
the flyer had reasonable suspicion about the person it targeted, "then reliance on that flyer
or bulletin justifies a stop to check identification, to pose questions to the person, or to
detain the person briefly while attempting to obtain further information." *Id.* at 232
(citations omitted).

supplied a cover story (the putative headlight infraction) that would mask the basis for his alternative probable cause (the drug trafficking)." *Id.* Thus, the DEA task force's knowledge could "be imputed" to the patrolman under the "fellow officer" rule. *Id.*

The "collective knowledge" doctrine is not without limits, however. The Tenth Circuit has explained that, for the "collective knowledge" doctrine to apply, "there must be some communication between the officer or officers with probable cause and the officer who executes the stop or search." *Id.* at 1347 n.13 (citations omitted). "This communication confirms that the officers are functioning as a team." *Id.* Thus, "[s]o long as agents and officers use reliable channels to communicate their instructions to other officers, and those instructions accurately reach those officers, the collective knowledge doctrine allows courts to impute the directing officers' probable cause to the officers in the field." *United States v. Gonzalez*, 121 F. Supp. 3d 1094, 1173 (D.N.M. 2015).

Here, there is sufficient evidence of record that Lt. Castlebury, Inspector Klika, Detective Cadena, and the other officers present on August 3 were functioning and communicating as a team. On August 3, members of VCAT were conducting surveillance of Mr. Johnson's funeral. Inspector Klika, Detective Cadena, and Officer Sellers, among other officers, were in the funeral home parking lot in unmarked police cars conducting surveillance. As part of the operation, other officers, including Lt. Castlebury, were positioned nearby in marked police units.

Around 1:30 p.m., Lt. Castlebury heard Inspector Klika on the police radio indicate that he had observed the driver of a black SUV leave the funeral home armed with a handgun. Detectives Cadena and Sellers maintained continuous surveillance on the

SUV and relayed its location over the police radio. Additionally, Air One maintained continuous surveillance from the air calling out a description of the vehicle and its location. Lt. Castlebury testified that it was clear to him from the directions of Detective Cadena and Air One which vehicle the officers were referring to on the police radio. From the Court's review of the Air One video, the police helicopter initiates surveillance of the black SUV at 13:32:21. One officer can be heard on the police radio indicating that the driver of the black SUV had a firearm. Detective Cadena ("Wes") and Lt. Castlebury ("Josh") can also be heard on the police radio. At 13:34:16, an officer in the police helicopter states, "We're with you, Josh," as Lt. Castlebury indicates he is about to effectuate a traffic stop of the black SUV.

Shortly thereafter, Lt. Castlebury "fell in behind" the SUV and conducted the traffic stop of Mr. Jones. The "close cooperation" between Lt. Castlebury and the other officers "satisfies the Tenth Circuit's relatively low threshold that there be 'some communication between the officer or officers with probable cause and the officer who executes the stop or search.'" *Id.* at 1171 (quoting *Chavez*, 534 F.3d at 1347 n.13).

Mr. Jones asserts that because Inspector Klika did not prepare a police report noting his observations of the firearm, and because a civil lawsuit is pending against him in federal court for allegedly preparing and presenting a probable cause affidavit with false or misleading information in an unrelated case, Lt. Castlebury should not have relied on the information that Inspector Klika relayed over the police radio. *See Dominique J. Hendrix v. Michael Klika, et al.*, Case No. 22-cv-00375-D (W.D. Okla.). This assertion was made during defense counsel's argument at the suppression hearing.

There is no evidence of record that Lt. Castlebury knew of the civil allegations against Inspector Klika when he effectuated the traffic stop on August 3, 2022. No questions were asked of Lt. Castlebury during the hearing concerning his opinion of Inspector Klika's credibility. Thus, Mr. Jones has not presented any evidence that Lt. Castlebury had any reason to question the information he received over the police radio from Inspector Klika. Additionally, the civil lawsuit involving Inspector Klika is still pending; there has been no finding by the court or a jury that Inspector Klika did anything wrong in that unrelated case.

In any event, Lt. Castlebury observed a traffic violation, and he did not prolong the traffic stop any longer than was necessary to conduct the requisite computer checks. Inspector Klika's information was also corroborated by the fact that officers found a firearm inside the vehicle. Under the "fellow officer" rule, Lt. Castlebury was operating under the assumption that a firearm was present inside the vehicle when he effectuated the traffic stop, as well as drawing on his own experience in conducting previous surveillance of gang-related funerals where, as he put it, gang members' "emotions are high" and they are generally armed. Examining this from a "reasonable officer's perspective" and looking at the totality of the circumstances, the Court finds that Lt. Castlebury had a "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (citation omitted). As such, the traffic stop was reasonable in its scope and duration.

24

**C.**     **Mr. Jones freely and voluntarily consented to the search of the vehicle.**

Mr. Jones challenges the search of the vehicle. At the time of the search, however, the traffic stop was still ongoing, and Mr. Jones had freely and voluntarily consented to a search of the vehicle. "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances . . . ." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). The Tenth Circuit has adopted a two-part test to make this determination: (1) "'the government must proffer clear and positive testimony that consent was unequivocal and specific and freely [and intelligently] given,'" and (2) "the government must prove that this consent was given without implied or express duress or coercion." *Id.* (quoting *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996)).

In *Zubia-Melendez*, the requested consent to search the vehicle, like the instant case, occurred off-screen in the videotape; the Tenth Circuit concluded the appellant's consent to search was voluntary. *Id.* Here, the evidence on screen substantiates that Mr. Jones' consent to search was voluntary. Following the alleged consent off-screen, Mr. Jones, unhandcuffed, sits in the backseat of the patrol car while Lt. Castlebury fills out the field interview card and the two discuss the funeral and what happened to Mr. Jones' brother. Their cordial exchange is corroborated from the dashcam footage. At 13:40:00, during this exchange, Lt. Castlebury directs Officer White to conduct a consent search of the vehicle. Mr. Jones, who is within earshot, does not object. Further, Mr. Jones sits in the police car with Lt. Castlebury and watches the officers execute a search of the vehicle

and never revokes his consent. He later tells Officer Boxwell, "I even gave you all consent to search the vehicle."

Nothing from the video or from the testimony suggests that Mr. Jones' consent was the product of implied or express duress or coercion. The officers testified that he was coherent and not under the influence of alcohol or drugs, and the Court's review of the videos confirms that. Neither Lt. Castlebury nor the officers conducting the search showed any signs of force; they did not display their weapons. Mr. Jones did not voice any objections or concerns when the officers were conducting the search as he and Lt. Castlebury looked on from the police car. *See*, *e.g.*, *United States v. Olivas*, 351 F. Supp. 2d 1180, 1187 (D. Kan. 2004) (finding consent to search was voluntary where the defendant "was in a position to observe the search and express an objection if the search exceeded the scope of his consent"). Mr. Jones does not get upset until after he learns the officers found the firearm.

Mr. Jones asserts that he was not in a position to give voluntary consent to search because he was escorted back to the police car with his fingers interlaced and hands behind his back. The video shows that Mr. Jones remained unhandcuffed, and that Lt. Castlebury escorted him using only one hand while Detective Cadena followed behind without physically touching Mr. Jones. A person who is detained may give voluntary consent to search. *See United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997) (citing *McRae*, 81 F.3d at 1537); *see also United States v. Davis*, 636 F.3d 1281, 1293 (10th Cir. 2011). Further, it is well established that once a motor vehicle is lawfully detained for a traffic stop, the police may order the driver and other occupants of the

26

vehicle to get out of the car pending completion of the stop without violating the Fourth Amendment. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *see Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997). As such, the Court finds that Mr. Jones' consent was freely and voluntarily given in line with the required legal standard and based upon the totality of the circumstances.

**D.    Mr. Jones' waiver of his Fifth Amendment rights was voluntary.**

Finally, Mr. Jones seeks to suppress the statements he made to Lt. Castlebury and Officer Boxwell as part of the traffic stop. Mr. Jones asserts that he unequivocally invoked his *Miranda* rights with Lt. Castlebury and that Officer Boxwell should not have initiated contact with him after invocation of his Fifth Amendment rights. As a result, he contends that his statements to both officers were not voluntarily made and, as such, are inadmissible at trial. The United States contends that Mr. Jones knowingly, voluntarily, and intelligently confessed after a proper *Miranda* warning. The Court agrees that Mr. Jones was properly advised of his rights, and that his statements were given voluntarily.

The Court finds that Mr. Jones was in custody for purposes of *Miranda* when Lt. Castlebury placed him in handcuffs at 13:46:45 and told him he was not free to go. This transpired just after Lt. Castlebury examined the firearm that Officer White seized from Mr. Jones' vehicle. As evidenced from the dashcam video, Lt. Castlebury attempted to read Mr. Jones his *Miranda* rights several times, but he was unable to finish the process because each time Mr. Jones spoke over him in an excited manner. Mr. Jones never gave Lt. Castlebury a clear answer as to whether he wanted to talk, nor did he ever invoke his

right to counsel or his right to remain silent. Rather, he continued to talk over Lt. Castlebury.

Because Mr. Jones was "wrapped up in his emotions," Lt. Castlebury took a break and arranged for Officer Boxwell to speak to Mr. Jones. About 4 to 5 minutes later, after Mr. Jones' handcuffs were adjusted and he was moved from Lt. Castlebury's police car to the backseat of Officer Boxwell's police car, Officer Boxwell initiated contact with Mr. Jones.

Officer Boxwell asked Mr. Jones if they could talk "man to man," and Mr. Jones replied, "I'm listening." Officer Boxwell then stated that he needed to read Mr. Jones his *Miranda* rights before they spoke, and Mr. Jones stated that the other officer already did that 2 to 3 times. Officer Boxwell then read *Miranda* from a *Miranda* card and asked Mr. Jones if he wanted to talk to him, and Mr. Jones stated, "yes." At no point in time did Mr. Jones invoke his right to counsel or his right to remain silent.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly, and intelligently." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008); *see also Jackson v. Denno*, 378 U.S. 368, 394 (1964) (holding that a defendant is entitled to have an evidentiary hearing on the voluntariness of a confession before his case is tried to a jury); 18 U.S.C. § 3501. An express statement is not required; the waiver can be inferred from the person's actions or words. *See United States v. Nelson*, 450 F.3d 1201, 1211 (10th Cir. 2006).

Further, "[t]o establish a waiver of Fifth Amendment rights, the government must show (1) that the waiver was voluntary in the sense that it was a product of free and

deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). In determining whether a defendant's statements were involuntarily made, the Court examines "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (citations omitted). Relevant factors include the age, intelligence, and education of the defendant; the length of the detention and questioning; the use of physical punishment; whether *Miranda* safeguards were administered; and the location of the interrogation. *Id.*; *see also* 18 U.S.C. § 3501(b) (identifying factors to consider).

A request for counsel must be clear and unequivocal. *See Davis v. United States*, 512 U.S. 452, 459 (1994). "Although a suspect need not speak with the discrimination of an Oxford [professor], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (citations omitted).

Moreover, "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010). Finally, the Fifth Amendment does not require a person to sign a written waiver. *See United States v. Granados*, 846 F. Supp. 921, 925–26 & n.2 (D. Kan. 1994) (holding that the failure of the police to offer a written form does not vitiate a waiver of *Miranda* rights); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (noting that an

express written waiver is neither "necessary or sufficient to establish waiver" and that the "question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived" his rights).

Having examined the totality of all the circumstances, including the characteristics of Mr. Jones and the details of the interrogation and the relevant factors, the Court finds that neither Lt. Castlebury nor Officer Boxwell unlawfully coerced Mr. Jones into providing involuntary statements. Mr. Jones is a mechanic in his late-30s.[16] His education level is unknown to the Court, but there is nothing of record to suggest that he suffers from any physical or mental disabilities. He has a prior felony conviction and prior contacts with police, and he has served time in prison.

In addition, Mr. Jones was read his *Miranda* rights more than once, which he acknowledged, and informed of his right to counsel and right to remain silent. Although he was emotional during the questioning (more so with Lt. Castlebury than with Officer Boxwell), Mr. Jones was coherent, he gave clear and appropriate answers to the questions asked of him, and he exhibited no signs of intoxication. *See*, *e.g.*, *United States v. Tafoya*, 399 F. Supp. 2d 1227, 1238–39 (D.N.M. 2005) (finding that the defendant, although emotional after the violent death of his wife, voluntarily and knowingly waived his *Miranda* rights).

Officer Boxwell's interview of Mr. Jones was relatively short, lasting only 5 to 10 minutes. Officer Boxwell stated that it is his practice to interview in the backseat so that

---

[16] *See* Defendant's date of birth at [Doc. No. 1-1].

he can experience the same environment as the person being interviewed. Mr. Jones did not complain of the temperature inside the patrol car. Officer Boxwell adjusted Mr. Jones' handcuffs when he complained about them being too tight, and he provided Mr. Jones with water at the conclusion of the brief interview. At no point in time did any officer threaten or coerce Mr. Jones into making statements or make any promises of lenient or favorable treatment. At no point in time did Mr. Jones invoke his right to counsel or his right to remain silent, and Mr. Jones points to no authority, nor does the Court find any, that suggests that Officer Boxwell could not initiate contact with Mr. Jones after Lt. Castlebury's attempts to read *Miranda* failed. Accordingly, the Court finds that Mr. Jones was properly advised of his rights, and his statements to law enforcement on August 3, 2022, were voluntarily made.

## IV.    **<u>CONCLUSION</u>**

For these reasons, the Court **DENIES** Defendant Louis Jerome Jones' Motion to Suppress Evidence and Statements and Brief in Support [Doc. No. 27] and Mr. Jones' *Jackson v. Denno* challenge to the voluntariness of his statements as part of his Omnibus Motion in Limine [Doc. No. 40]. The Court will take up by separate order, if necessary, the other issues raised by Mr. Jones in his Omnibus Motion in Limine, including his challenges under Federal Rules of Evidence 403 and 404 as they relate to the admissibility of Mr. Jones' statements about his gang affiliation, criminal history, and unrelated crimes.

IT IS SO ORDERED this 30th day of December 2022.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE